We will proceed to the next case, which is the United States v. Badiane. Good morning. Come right up, if you would. Thank you, Judge. May it please the Court, my name is Julie Holt from the Federal Defender's Office, and I represent Mamadou Badiane. I will discuss the District Court's failure to give Mr. Badiane any remedy in response to the government's inexcusable late discovery disclosures in this case, as well as the sentencing issues. The totality of what happened in this case created a unique combination of circumstances that deprived Mr. Badiane of a fair trial, and he should receive a new one. The night before trial, the government turned over to Defense an additional 200 pages of discovery, consisting of Mr. Badiane's entire alien file. This nearly doubled the discovery in the case. Then, at 9.41 p.m., less than 12 hours before this trial was scheduled to start, the government filed its exhibit list. When the defense saw that for the first time, defense realized that the government intended to introduce a multitude of 404B evidence for which they had given the defense no notice. When the trial began at 9 a.m. the next morning, the defense moved for its second motion for continuance, based on the late discovery, the short period of time the defense had been appointed to the case, as well as the 404B. It wasn't a notice, but the new information that the government intended to introduce 404B evidence. The district court denied that. In the alternative, the defense moved to exclude the 404B evidence and the late discovery. The district court also denied Mr. Badiane that remedy. When the trial started, the defense did not have an opportunity to review with Mr. Badiane, to consult or confer with him about that 200 pages of discovery turned over the night before, nor did the defense have the opportunity to confer with Mr. Badiane about the 404B evidence that they now knew the government intended to introduce, and how that would play into Mr. Badiane's decision whether or not to testify in this case. I want to talk first about the 404B. The 404B was a motion to withdraw. It was heard by the magistrate judge. Was that an appointed counsel or a retained counsel at the outset? I believe it was retained. The 404B was a motion to withdraw. It was heard by the magistrate judge. The 404B was a motion to withdraw.  I don't believe that was the issue for him moving to withdraw from the case. My recollection is that there was a $6,000 retainer that Judge Garber in his order found that the attorney, Mr. Pierre, had done enough work to . . . What was the dispute between Mr. Pierre and Mr. Badiane about? Why did the defendant want to dismiss Mr. Pierre? The record is not entirely clear on that. Mr. Pierre's motion to withdraw stated irreconcilable differences. Mr. Badiane's motion was less clear as far as the particulars of what the disagreements were. Later on in the record, in one of the pretrial hearings, there is discussion where they talk about the fact that Mr. Pierre had negotiated a plea offer that was not what Mr. Badiane had originally intended. There were two counts. The first was the passport . . . In any event, 22 days is when you were appointed and then you said you worked a lot on trying to do a plea agreement for most of it. Correct, Judge. It was a total period of 22 days that the public defender was assigned to the case before the trial started. Let me ask one other fact question here. Did there not come a time when the defendant himself moved the district court to dismiss the indictment on speedy trial grounds? He did, Your Honor. Was he counseled at the time that he moved, pro se? No. This was between the time that the district court discharged Lawyer 1 on his motion and appointed you. Exactly. I believe it was a week. The first lawyer was dismissed July 14th and then the federal public defender was appointed July 22nd and then a specific lawyer was assigned July 26th. In that interim, the district court had appointed the federal public defender for one purpose only, to determine whether or not Mr. Badiane qualified for the public defender. During that gap, the defendant says, you know what, this thing is sitting too long. This should be dismissed on speedy trial grounds. Correct. So it was in that time period that he filed this pro se motion. So the delay from the time of the indictment to the time of trial is how long? The indictment was filed, I believe, April 4th, 2016, and then the trial began August 17th, 2016. So it's four and a half months, roughly. I appreciate you were only there three weeks. It's not just three weeks, it's the government dumping all this stuff on you on the eve of trial. I assume there was a pre-trial order saying they had to do this 10 days before trial, like the rule requires. Correct. Well, the trial order actually referred to local rule 8810 with regard to the discovery and required the government to give the discovery 14 days after arraignment, which the public defender only had the initial discovery, which was 230 pages for seven days, but certainly only had this additional 200 pages for 14 hours before the trial started. Help me with the issue of prejudice. As I understand it in this case, the argument is that by getting this dumped on you so late in the day, you didn't really have a chance, A, to digest it, B, to consult with your client, and C, to come up with other witnesses who might have rebutted or countered what they were presenting. Tell me more specifically, if you can, what the prejudice was. Yes, Your Honor. And that if you had had an additional week or 10 days or two weeks or a month, what you would have done that you were unable to do here because there was no continuance? Yes, Your Honor. First and foremost, there were five witnesses who could have corroborated Mr. Barillon's testimony and the defense in this case, that the victim, Nestle Metair, sold his own identity to Mr. Barillon. There were two witnesses who went to the meeting, one of the meetings between Mr. Metair and Mr. Barillon, and could have testified that Mr. Metair introduced himself as Enrico, and that this Enrico person was in fact the alleged victim in the case, Mr. Metair. There were two witnesses who could have testified that the man known as Enrico offered to sell the documents to Mr. Barillon and represented that they were of a fictitious person, which the issue and dispute here was whether Mr. Barillon knew that the documents belonged to a real person. His testimony at trial was that the man who sold them to him told him they belonged to a, they did not belong to a real person, they were fictitious. He had someone at the vital statistics office who could input this information and create an identity. So those two witnesses could have corroborated that testimony of Mr. Barillon's, that the person who sold him the identity said they were not of a real person, which was the only issue in debate. Additionally, the defense could have gathered evidence to show that Mr. Barillon's family did live in London, and his intention was to return back to London, which was part of his testimony and his explanation as to why he needed the documents in the first place. Now is all that material that you just outlined in the record? Yes, Your Honor. It's in the motion for the new trial, which I believe is docket entry 63. So what did the district court say when you came back and said, look, we had some really corroborative evidence that suggested that what the defendant was saying was true and certainly went to one of the critical issues in the case, certainly one of the elements that the government had to prove beyond a reasonable doubt. The district court in its order denying the motion for new trial did not, my recollection is, did not really engage . . . And the district court did not engage in the particular of what . . . of the evidence that the defense could have introduced would it have had more time to prepare this case. Let me ask you this. How long did the whole trial take? It was one and a half days. The jury was out before lunch on the second day. So it was less than two days from the time the jury was sworn to the time they rendered a verdict. Correct, Your Honor. And if I may, I just want to highlight that the . . . Before you leave, I always worry about this. Was this like a second week of a trial calendar or the first week? Because as a district court, I would sometimes set a two-week trial calendar and I've got all these cases set and they fall to pleas or maybe there's something left to try. How is this trial calendar set? That's an excellent question. I believe that this was the beginning of the two-week trial period. I'm not 100% certain. Well, what would the record tell me? I'll ask the government the same question. This ought to be something y'all could stipulate. It's a public record. I could try to go figure it out as to what Judge Middlebrook's published here. Because it just is troubling because I've had another case recently where they just dump everything. You're saying if we keep approving this, then it's just problematic? Correct. That is my position. I'm not sure . . . I don't recall exactly whether this was the beginning of a two-week trial period. I believe that it was, that it was set because I know that's how . . . You and the government could figure this out, right? Yes, certainly that would be . . . That answers my question. I take it there's no dispute that when the prosecutor gave you the information, the prosecutor had just gotten the information that night, right? Correct. There's no indication the government . . . the prosecutor sat on the information. Correct. There's no indication the prosecutor did. However, the government had that information. I understand the government is a lot more than the prosecutor. Okay, correct, Your Honor. The record reflects that the government got the alien file the night before, but the . . . How long before do we know, from your point of view, that the government asked for the alien file? Or do they come in and say, well, we thought it was complete, so we didn't ask, so we . . . They've got to ask the other agency to get the file, right? Correct. Do we know when the government asked the other agency to produce the file? I don't know that information. I know that in the hearing discussing this, the government maintained only that it received the file the night before. The defense counsel in the case did bring up the fact that their agent had had it since February, but there was no discussion as to when the particular prosecutor requested that file. When you say agent had had it, who are you talking about? There's an agent, Percy, I believe, that in the initial discovery, the first 231 pages, it indicates that this agent in Georgia had Mr. Badion's alien file beginning in February 2016. Is it an agent for the U.S. attorneys? What kind of agent? I believe it was an FBI agent. Let me ask you just a final question, and you're on our time. You will have your full time for rebuttal. Thank you, Judge. One of the things that sort of perplexed me about this, if I have this right, and correct me if I made a mistake on the record, didn't Badion present exactly this defense in his pro se motion to dismiss the indictment before you were appointed to the case? In other words, didn't he suggest all of this earlier, that is to say, would have corroborated his testimony that Mateo sold him the identifying documents? Isn't that really what he says? And if that's so, didn't he already know it, even independent of this drop of the materials the night before? He did. That was what he laid out in his pro se motion. The very substance of what you wanted to present with five corroborative witnesses. Yes. If I'm understanding your question or the intent of your question, it's whether the defense, we had known the defense or the defense was previously laid out? Yes and yes. Okay. Yes, so he did lay that out in his pro se motion, and that was the defense at trial. I think the distinction and the prejudice comes where, again, the public defender was on the case for 22 days, had discovery for seven. Right, right, right, right, but I guess what I'm asking is, Badion well knew that he had these corroborative witnesses, didn't he? Yes, he knew that information. And he says, I'm getting on the stand, and I'm going to tell my story. Defense lawyer puts him on the stand, and he testifies. But if, in fact, Badion knew and indeed raised the very issue substantially before, he could have discussed it with his lawyer. He was aware of this. I guess it's the prejudice that I'm raising. He was capable of rebutting independent of anything that was presented in the dump the night before because he was peculiarly in possession of all this. At least this is what I'm asking. Maybe I misunderstand this. No, I think I understand your question, which is the evidence that the defense could have gathered to corroborate the general defense. Correct. Yes, that was not related to the alien file dump the night before. That prejudice is related to the extremely limited amount of time the defense had the case. However, the prejudice from the dump the night before comes with the 404B evidence, that the government was required to give notice to the defense. Okay, to the extent that it's the 404B stuff, to the extent that it wasn't just 404B but was otherwise intrinsic, then the notice requirements are a little different, aren't they? Correct. But this was not intrinsically related. And, in fact, the government themselves extricated the four passport applications that they claimed Mr. Barillon submitted in different names, Exhibits 1C through F. The government did not even introduce them in their case in chief. So the government themselves extricated that from their story and their presentation. In order to be inextricably intertwined, it has to be linked in time and circumstance. It has to be a necessary part of the account or an integral and natural part. And the government did not even introduce that in the case in chief, showing that that was not, in fact, inextricably intertwined, particularly because the only issue in dispute was Mr. Barillon's intent and whether he had knowledge. I think we have it, and you've reserved your full rebuttal. Thanks very much. Good morning. May I please the court. AUSA Jonathan Stratton on behalf of the United States. With me at council table is AUSA Michael Takor, who tried this case with me in the district court. I want to get to a few questions raised by Your Honor. The indictment was on March 29th, and trial was August 18th. To Judge Hall's question in regards to the first or second week of the trial period, this was set on a Wednesday of the first week. For a little context, the defendant was intending to change his plea on that Monday, the Wednesday before trial. He had filed in his pro se motion, which Your Honor alluded to, that he was guilty of count one and that he was not guilty of count two because he did not know the individual was a real person. That was what he was going to plead to on that Monday. He arrived Monday morning before the magistrate judge to which the matter was referred and refused to change his plea, saying he hadn't had enough time to consider the plea agreement. The judge recessed until 3 p.m. that afternoon so he could have more time to speak with his lawyers. At 3 p.m. that afternoon, he again refused to change his plea. It is on that Monday- That's when he was represented by Pierre. No, that is the Monday before trial. He was already represented by the public defender. He was represented by the public defender. That plea negotiation happened with the public defender's office, and everyone believed, according to his pro se filing, that he was going to change his plea that morning and then again that afternoon. He did not. At about 3.30 on that Monday is when the government began every attempt to obtain the alien file. Now, in regards to the 200 pages of the alien file that was produced, I myself walked it over to AFPD Julie Holt that evening when we received it on Tuesday. Of that 200 pages, only six of those pages were used at trial. These pages referenced the defendant's contacts with United States immigration, and all of those contacts were disclosed in the initial discovery that was produced April 19. So, roughly- How were they disclosed? They were disclosed in reports of investigation. It indicated that the defendant had two previous times once tried to enter the United States in New York and was denied entry. Once he tried to enter the United States through Toronto, Canada and was denied entry. It was also an order of removal from 2001, and then it was a copy of his French passport. All of that are the defendant's actions, and as Your Honor, Judge Marcus alluded to, he was aware that he had this contact with the United States immigration before, let alone in the discovery, but because of his own actions. But then also, these were the documents from the alien file, which we used to prove up that he had previously tried to gain status here in the United States. Let me ask you just two questions about this. One, when did the government – Does the record reflect when the government sought the alien file from the administrative agency? We began that Monday. The record we indicated to Judge Middlebrooks in the district court on Wednesday morning. That transcript is docket entry 116. You asked for it on Monday, got it Tuesday night, and turned it over Tuesday night? Immediately, Your Honor. You waited until the eve of trial to ask for it, and then when you did, they gave it to you promptly, and you promptly disgorged it albeit the day before the trial? Correct. You asked for it from whom? So it was actually – it was originally in the FBI's possession. We were working – our case agent was from Diplomatic Security Services. It turned out that the file was with United States Customs and Immigration Services, and then we had a witness from USCIS who testified as to his contents. I want to go back to a question that both I asked and Judge Fay asked again. I want you to take your time and tell me in particular. What was it specifically that was disgorged the night before in the six pages you used that had been turned over in discovery months earlier to the defendant by your lights of it? Yes, Your Honor. In the reports of investigation, it had disclosed to the defendant that he had an order of removal that was dated June 11, 2001. That was Government's Exhibit 4. In another report of investigation, he had a denied entry from March 29 of 2006 where he was denied entry when he tried to enter the United States in Toronto, Canada. That was Government's Exhibit 5. In another report of investigation that was, again, delivered on April 19, 2016, was another denial of entry in New York City. What was the date on that? That was April 29, 2009. He tried to enter in New York City. That was a separate denial of entry. Correct. Different from the March 29, 2006. What exhibit was that? That was Government's Exhibit 6A and attached to that was Government's Exhibit 6B which in conjunction with his denial of entry in New York City was a notice to detain and deport Mr. Badyan. What was the date on the notice to detain and deport? April 29, 2009. That was 6B. That was 6B. Then finally it's Government's Exhibit 6C which was a copy of the defendant's French passport which he tried to use to enter the United States. Those were the materials, among others, that were given to the defendant on the night before the trial. The documents to support that. Correct. Now were those materials in words or substance given to the defendant earlier in discovery? Correct. It was given... Tell me how it was given and when it was given. It was given on April 19 and it was given in... This was in a general packet of discovery the prosecutor made available? Approximately 250 pages of discovery. In that as well, Your Honor, and I want to be clear about this, AFPD Julie Hull referenced previous fraudulent passport applications by the defendant. That initial discovery also had those previous applications. I want to be very precise and specific about my question. Of course. On April 19, did the government turn over, in words or substance, the order of removal, June 11, 2001, what became government for? Correct. Did you turn over the denial of entry on March 29, 2006? Yes. Again, on April 19? All of this is on April 19, yes, Your Honor. How did you turn it over? Was it like in a DEA report where it summarized these? If so, what is the document in April 19 that outlines the substance of this? You agree you didn't give the documents, right? I didn't give the documents. But you're saying you gave the substance of what the documents showed. Is all of it in one report? There's two reports, Your Honor. Okay. What are the data reports if we go look at the first discovery turnover? Is the first discovery turnover in this record? Yes, Your Honor. Okay. And so what are the two reports that give the substance of these six documents? It's the reports from diplomatic security services that looked at the defendant's prior contacts with immigration. There's more than one? Yes, Your Honor. There are two? I believe so. The two reports from diplomatic services of the Department of State that summarize the substance of what was in the actual hard copy of the documents disgorged the day before the trial. Is that what we have here? Yes, Your Honor. Do you have the date of those two reports so we can just look at them? I can provide that to you, Your Honor. I do not have it. Where will we find in the record what docket entry reveals the April 19th discovery turnover by the prosecutor to the defendant? Cite me to the record so I can look at it. Absolutely, Your Honor. It is docket entry 16, which is the government's first response to the standing discovery order. To be clear, that response was filed on April 21st, but it says in that response that that discovery was produced on April 19th. Original defense counsel, Mr. Andre Pierre, came and picked it up at my office. Are you telling us that in that report you're not relying on this? I'll quote it for you. You're not relying on language that says, all evidence made available for inspection. Certainly, in our standing discovery order response, we indicate to defense counsel that all of this information that is produced may be relied upon. You understand the questions we're asking is, did you refer specifically to the items you introduced into evidence? No, we did not refer specifically. That's correct, Your Honor. That was Judge Marcus' question. I'm confused. Mr. Stratton, maybe you can help me. Yes. The claim of the defendant is that these materials were turned over so late in the day that they couldn't come up with five witnesses who would have corroborated the defendant's account. One of your responses was, well, he knew anyway, but that isn't really the question that both Judge Fay and I are focusing on. What I want to know is when you made your first response, when you made your discovery responses on the front end of the case to the defense attorney and said, here's this stuff, make of it what you will, was included in the materials you gave to the defendant in April, the reports from the diplomatic services of the Department of State that reflected in summary form the order of removal June 11, 2001, the denial of entry on March 29, 2006, the denial of entry on April 29, 2009, the notice to detain and deport April 29, 2009, and a copy of the defendant's passport. Yes. The answer to the question is absolutely yes. The copy of the defendant's passport obviously was not in there, but it did say the defendant had a French passport. So in sum and substance, the answer to your question is yes. Okay. So there was a summary of everything and a statement that he had the French passport, but that was not the score. You didn't actually have a copy of the French passport. Correct. And this was disclosed in the first response on April the 21st. It was actually produced on April 19th. The filing was April 24th. Okay. But yes. All right. You can go on with your argument. Okay. Before you do, did the government oppose the motion to continue in August or was silent about it? It was actually a joint motion. Oh, so you – So – The government asked for a continuance too because you just turned this over. That and we had – we believed that there was a potential resolution of the trial should the defendant have more time. Possible plea. A possible plea. And we reflected that in our joint motion. I want to say that this case had been continued twice before. My agreement, which is part of why the court probably didn't – There were several issues at play. It had been continued twice before. As Judge Marcus alluded to, he filed a pro se motion alleging violation of his speedy trial rights. In that motion, he indicated that he had told his previous defense counsel to not file a motion for continuance under any circumstance. Judge Middlebrooks found that to be puzzling in the least because the defendant was present at the first motion or at the first calendar call when defense counsel asked for the motion to continue and the defendant didn't do anything. And so that was part of, I think, the irreconcilable differences that the defendant at this point said, I never told my previous attorney to file a motion for continuance and I want a prompt resolution of my case. That was at play. The other thing that was at play is – I assume he's in jail now serving his sentence. That's correct, Your Honor. And there was an issue with obtaining French interpreters that Judge Middlebrooks alluded to that made scheduling a little more difficult and he did not want to continue the case another time. So French interpreters or French witnesses? Interpreters, Your Honor. There had to be two throughout the entire trial. Where were the witnesses brought in from? So most of the witnesses were local. There was an individual from Georgia Department of Motor Vehicles where the defendant had obtained a Georgia identification card. He flew in from the Atlanta area and testified as to the processes which Georgia utilizes in order to verify someone's identity to obtain an identification card. Other than that, the witnesses were local. With regard to this file, there was some indication that maybe an FBI agent in Georgia had the alien file early on, but what I'm hearing you say is it was given back to Customs? Originally it was with the FBI in Georgia where the defendant was originally arrested. When we sought to obtain it that Monday evening and actually obtained it Tuesday, it was in the possession of the United States Customs and Immigration Service. I'm sure part of this is because you thought he was going to plea, but you'd already seen him twice not plea, so why didn't you request the alien file before the Monday of the trial? We see they promptly turned it over. The FBI had it at one point. He's been arrested. I'm just talking about procedures. Why didn't the FBI just go in and send it to you? You know you're going to potentially need it. Certainly that would have been best practices, Your Honor. I know, but not just best practice, normal practices. To go in and get the alien file here, you're getting ready to try two immigration-related cases, counts. I don't understand why you don't get the file well before this or ask for it. You're certainly right. We did believe that the defendant was going to plead because he had filed. We always believe that in every case, and he'd already had two times he said he was going to plea and he didn't. So you already knew he wasn't really going to plea possibly. He said he was going to plead on the Monday before trial, and he had filed his pro se motion saying, I am willing to plead to count one and I am not guilty of count two, and that was the plea that was offered to him. I know, but that's all on before Monday of trial. The point is you don't know about this. Why don't you get it in July? I mean, you don't know he's going to plea. He's fired his lawyer because he says he's trying to get me to plea.  Frankly, we should have, Your Honor. If there are no further questions, I see that I'm out of time. Thank you very much. Thank you. Ms. Holt, I need your help. Yes. Do you agree or disagree with the language of the response that was filed on April 21? With the language? I'm sorry, can you be more specific? Did indeed the government give you or give the defendant notice on April 21 specifically about the order of removal dated June 11, 2001, the withdrawal of the application for admission dated March 29, 2006, the withdrawal of the second application for admission dated April 29, 2009, the notice to detain, remove, or present the alien dated April 29, 2009, and the French passport? There was reference to these events in the government's initial discovery that was turned over, and I would refer the court to docket entry 67, which is the government's response to the defense motion for new trial. In that response, the government attaches the reports. He said it was in docket entry 16 in the first response, which was turned over on the 19th and mailed on the 21st, if I heard him right. That is to say the diplomatic reports from the Department of State which reflected specifically each of those dates for each of those items that Judge Faye just related. That would be the initial discovery order? Yes. Was it in the initial discovery order? Did they tell you in words? It didn't give you the documents, but they summarized the content of the document and said here's what happened laying out these five items. When I pick up docket entry 16, which I can assure you I will, I'm going to look at it, and will I see when I look, will I find one, two reports from the diplomatic services, and two, will they reflect in summary form the contents of each of these five items? The reports, why I mentioned docket entry 67 is because I believe the docket does not include the full discovery. It's just the initial discovery response, the filing by the government, but not the initial discovery. The reports are actually in docket entry 67. When was that turned over to you? Docket entry 67, these reports are the initial discovery that was turned over seven days before trial. They give . . . I'm going to just ask a clarifying question because I find this in all the cases. Really what happens is you all don't scan into the electronic record. This is electronic record, right? Correct. They file, oh, I've done this discovery. Here's what we've done. They may have turned over the documents, but nobody scanned in what they turned over on April 19th. Is that what you're telling us? I find this all the time. We're up here, and everything everybody's arguing about is not in the electronic record on appeal because everybody just keeps it constantly in this jurisdiction. Trial exhibits, let me ask you this. Of the trial exhibits, if we go to the record here, am I going to file trial exhibits 56A, B, C in this record right now? Not in the docket. This was before the requirement for the electronic record. I know, so we worked on that, and finally our court has directed just the Southern District, because this is the only place that does this, to make sure that they cannot take anything out of the courtroom unless they give an electronic copy of it. It's bizarre to me that the Defense Bar lets the government take home all the trial exhibits. The order now precludes everybody from doing that, but you're right, it didn't become effective. I worked on this for two years, until December or November last year, right? Correct. Okay. Correct. The problem is, all of what you all are talking about, I know what you're trying to tell us. In the motion to new trial, they did attach a few of the records, so we can go back and see that. Correct. We don't have the discovery. We don't even have the trial exhibits in this case, is what you're telling me. Correct. And while the court can see . . . All the time. I mean, why, since you know that's the rule, why don't you all get together and go on and do it rather than . . . We can't go find it right now. The original discovery, we can't find it right now if we tried. Can I find docket entry 16? There is a docket entry, but I believe it will just be the government's filing that they have filed discovery, not the actual discovery itself. Docket entry. Did you get the diplomatic reports in that first response? My point being that, yes, they make reference to it, but if you . . . The answer to my question is yes. I just want to know where we are, Ms. Holt. Did you get on the front end of the case a summary from the diplomatic services in two reports that told you in words or substance order of removal June 11th, denial of entry March 29th, denial of entry April 29th, notice to detain and deport April 29th, and a reference to the fact that he had a French passport? A reference to the fact that he had a French passport, yes. The reference to the 2006 refusal of admission states the consulate confirmed the subject's arrest on March 2006 and subsequent deportation. That's the extent of it with regard. And then a few pages later the report says the DHS automated targeting system passenger shows an inbound flight by subject in 2009 arriving in New York. What about the order of removal June 11th, 2001? That I don't believe that was made clear in the reports. My point being that there's not anywhere in the reports where it lists out these are all of the instances of entry and removal, but they're referenced to in reports that include a lot of other information. So let me be clear on this. So we do not have the hard copy of docket entry 16. We would have to go online to find it. But if we go online, can we find it electronically? The discovery will not be attached to it. The only discovery in the docket is the government. I understand. Okay. What about docket entry 67? When I go back to look at that, will I find either a hard copy? Or if I go electronically, can I find that? Yes. And that will include some of the reports contained in discovery that the government's referring to. I forget the sum of reports. The diplomatic reports that reference these transactions, are they contained in docket entry 67? Yes. When did you get that? Was docket entry 67 entered or when did we get it? When did you receive the materials? These materials in docket entry 67 were turned over in initial discovery that the Public Defender's Office received August 10th, seven days before the trial started. You just attached them to the motion for a new trial. The government did, correct. Oh, the government did in the response to the motion for a new trial. Correct. Part of your argument is, yeah, you can go find some reference to it, but there's 200 pages we got in April, and these items are embedded in different documents, and so it didn't really call us to attention. I mean, that would be the argument. I don't know whether it's a good one or not. Okay, so you're trying to say the government, the district court aired and admitted Exhibits 1 through 6 ABC, but you've got the burden here, and you haven't put even the trial exhibits in the record. Is that correct? The records were filed, or the exhibits were filed as part of the briefing in this case. Okay, but they're not in the record, per se, if I went and looked at what was admitted at trial. Y'all attached them to your brief? They're not in the electronic record. They were attached to the briefing. They're not in the electronic record on the electronic docket. But just to be clear, that part of . . . And who attached? Did you attach them to your brief? I had missed them then. Yes, they were filed as part of the defense's brief, or the appellant's brief in this case. If I turn to the two of you and I say to you, within 10 days I want you to file a supplemental hard copy and make it part of this record, what was disgorged in the first response on April the 21st and in Docket Entry 67, can the two of you agree to do that? Is that something you could agree to put together for us and submit to us to make it part of this record so we can find in a single place at a single time the contents of what was disgorged on Round 1 and Round 2, Round 1 being the first response of discovery, April 21, and the second being what was contained in Docket Entry 67? Yes, that is something that I can do. And can you add the trial exhibits since we don't have that? In electronic form. We'd like it in hard copy and electronically. The exhibits are Government 4, 5, 6A, 6B, and 6C. So you'll... The exhibits are in the appendix, the defense file. So with exhibits 4, 5, 6A, B, and C we already have. Except for 6B because the Government was unable to find that after trial. It was presented to a jury and it was made part of the record, but the record doesn't reflect it because the Government maintained it, didn't leave it with the court, and the Government lost it. Is that the essence of it? That's my understanding, yes. Okay. That's why we have the rule that the Government can't take it out of the courtroom now. Particularly for the Southern District, we just amended our IOPs and had the Chief Judge here do an order, Judge Moore did an order, saying the Government can no longer take trial exhibits and keep them. They have to submit a scanned copy, electronic of them, before they can leave the courtroom. Let me ask you the last question. How many exhibits were admitted in all by the Government? There were 18, Your Honor. Okay. We wouldn't have that either, though. Those were filed in the appellant's appendix. So all of the exhibits that were offered and received in evidence are in your appendix. Correct. So we don't need that. Except for 6B. Correct. Except for 6B, which there's no way to produce. But the problem is what I want is what both sides agree, not just what some side attaches to their brief. What both parties agree is the record in this case of trial exhibits. All right. So to make it clear, I am directing both parties, the Government and the defense, to produce within 10 days of today the following materials, both hard copy and online. First, the materials that were disgorged by the United States on April 21st, Your Honor, about the date, whether it was the 19th or the 21st, what he said, what Mr. Stratton said, were contained in the first response and what he characterized as already being there in Docket Entry 16. And second, what was presented in Docket Entry 67. I want to see the diplomatic services reports is really what I'm getting at, and the exhibits. It's as simple as that. With that, we thank you all for your efforts, and we'll move on to the next case.